IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:15-CV-00157-RN

| | |
|---|---|
| **Melody S. Brown,**<br><br>        Plaintiff,<br><br>v.<br><br>**Carolyn Colvin**, Acting Commissioner of Social Security,<br><br>        Defendant. | **Memorandum & Order** |

       Plaintiff Melody S. Jones instituted this action on August 6, 2015, to challenge the denial of her application for social security income. Brown claims that Administrative Law Judge Thomas G. Henderson erred in his determination by failing to reconcile conflicting evidence, failing to properly consider the medical opinions, and failing to find that her impairments met or equaled Listings 1.02, 1.03, and 1.04. Both Brown and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 21, 25.

       After reviewing the parties' arguments, the court has determined that ALJ Henderson reached the appropriate decision. ALJ Henderson's reliance on the hearing testimony from a Vocational Expert ("VE") was not erroneous, his evaluation of the medical opinion evidence is proper, and Brown has failed to demonstrate any error at step three in consideration of the Listings. Therefore the undersigned magistrate judge denies Brown's Motion for Judgment on

the Pleadings, grants Colvin's Motion for Judgment on the Pleadings, and affirms the Commissioner's decision.[1]

I. Background

On December 29, 2011, Brown filed applications for disability benefits and supplemental security income on the basis of a disability that allegedly began on January 3, 2006. After her claims were denied at both the initial stage and upon reconsideration, Brown appeared before ALJ Henderson for a hearing to determine whether she was entitled to benefits. After the hearing, ALJ Henderson determined that Brown was not entitled to benefits because she was not disabled. Tr. at 25–34.

ALJ Henderson found that Brown had the following severe impairments: status post L5-6 microdiscectomy and status post T11-12 laminectomy with spinal cord stimulator implantation. *Id.* at 27. ALJ Henderson also found that her impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* ALJ Henderson determined that Brown had the RFC to perform light work, except she could perform only occasional postural activities and she required an opportunity to change from sitting or standing every 30 minutes. *Id.* at 28. ALJ Henderson also concluded that Brown was unable to perform her past work as a department manager, cashier, or stock clerk. *Id.* at 33. ALJ Henderson found that, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she was capable of performing. *Id.* at 33–34. These jobs included: routing clerk, work ticket distributor, and stock checker. *Id.* at 34. Thus, ALJ Henderson found that Brown was not disabled. *Id.*

---

[1] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). D.E. 14

2

Case 7:15-cv-00157-RN   Document 27   Filed 04/18/16   Page 2 of 19

After unsuccessfully seeking review by the Appeals Council, Brown commenced this action by filing a complaint pursuant to 42 U.S.C. § 405(g) on August 6, 2015. D.E. 5.

## II.   Analysis

### A.   Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.   Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to

3

Case 7:15-cv-00157-RN   Document 27   Filed 04/18/16   Page 3 of 19

determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

C. **Medical Background**

In 2005, Brown injured her back in an accident and sought emergency room treatment. Tr. at 401, 475. A March 2005 MRI showed broad based central and left paracentral disc herniation/protrusion, which slightly displaced the transversing left L-5 nerve root. Tr. at 472. Brown saw Dr. Francis Pecoraro for pain management. *Id*. at 465–68. She received medication, physical therapy, and steroid injections, as she continued to work. *Id*. at 466–71, 499–509, 511–17. A December 2005 CT scan showed six lumbar type vertebra with partial sacrilization. *Id*. at 463. She underwent microdiscectomy surgery with Dr. Jon Miller in January 2006. *Id*. at 380–81, 457–58, 460.

Following surgery, Brown experienced buttock and leg pain. *Id*. at 456, 459. Although she reported continued SI joint pain in March 2006, an MRI could not identify the source of her pain. *Id*. at 453–55. Brown continued to treat with Dr. Pecoraro for pain management. *Id*. at 451–52, 449–50. Plaintiff underwent an Independent Medical Examination ("IME") with Dr. Thomas Melin on July 31, 2006. *Id*. at 343–45. Dr. Melin noted good range of motion, lumbar tenderness, full strength, intact sensation, and normal reflexes. *Id.* at 343. He diagnosed status post L5-6 microdiscectomy with residual back pain and probable left L5-6 facet disease. *Id*. An MRI the following month showed degenerative changes at L5-S1 but no evidence or residual or recurrent herniation. *Id*. at 360, 392–93.

Brown underwent lumbar medial branch blocks in February 2007, which she reported helped her pain. *Id*. at 535–38, 356–57. She had branch blocks to other areas of her lumbar spine in April 2007. *Id*. at 533–34. In June 2007, Brown reported to Dr. Melin that she had significant improvement until two weeks earlier when she twisted and her pain returned. *Id*. at 355. Dr. Melin referred her for a fact block injection in July 2007. *Id*. at 531–32. In August 2007, Brown reported good pain control until she resumed normal activity. *Id*. at 354. Dr. Melin limited her to sedentary work with frequent position changes. *Id*. at 354.

Brown reported pain relief from facet blocks but also experienced lower extremity weakness. *Id*. at 353. Dr. Melin recommended radiofrequency lesioning. *Id*. at 352–53. Brown saw Dr. Patrick Boylan for a radiofrequency neurotomy treatment evaluation in January 2008. *Id*. at 377–79. Following radiofrequency neurotomy in February 2008, Brown reported a 30% improvement, although she continued to experience pain, primarily in her buttock and left leg. *Id*. at 370–71.

In April 2008, Brown reported to Dr. Melin that her low back was made worse by activity, as well as left leg weakness. *Id*. at 351. A CT scan demonstrated multilevel lumbar spondylosis and post-surgical changes at L4-5 with significant facet hypertrophy, but no nerve root impingement. *Id*. at 350–51, 395–96.

Brown underwent trial placement of a percutaneous spinal cord stimulator in September 2008, which resulted in the near complete elimination of her leg pain. *Id*. at 361–66. Brown returned to Dr. Miller who implanted a second spinal cord stimulator in October 2008. *Id*. at 382–83, 444–46. In December 2008, she reported diffuse myofascial pain to Dr. Pecoraro, who prescribed pain medication. *Id*. at 441.

The following month, Brown reported pain at the area of the spinal stimulator but also reported she was quite pleased with pain relief in her lower limb. *Id*. at 440. The stimulator was relocated to her abdomen and, in March 2009, Dr. Pecoraro noted she was doing quite well. *Id*. at 431. She was instructed to stretch and ice her back, and he prescribed pain medication. *Id*. at 432.

In April 2009, Brown saw Dr. Miller who administered an injection. *Id*. at 430. The following month, Dr. Miller reviewed a Functional Capacity Report showing that Brown could do a reduced range of light work, and he discharged her with that recommendation. *Id*. at 429. Dr. Pecoraro noted that Brown had 100 percent improvement in her leg pain but that her back pain continued. *Id*. at 428. He concluded she could perform sedentary work with a lifting restriction of 10 pounds and no lumbar flexation, extension, rotation, or tilt. *Id*.

Brown again saw Dr. Pecoraro in June 2009 for continuing back pain. *Id*. at 426. He concluded she had reached maximum medical improvement. *Id*. He stated she could do light duty work with ongoing medical management. *Id*. The following month, Dr. Pecoraro noted she complained of left-side buttock pain. *Id*. at 423–24. He refilled her prescriptions and transferred her care to her primary care physician. *Id*. at 424. However, Brown returned to Dr. Pecoraro in December 2009 and he continued to treat her pain with medication, joint blocks, and radiofrequency procedures. *Id*. at 408–22.

Brown had a consultative examination with Dr. Ayman Gebrail in April 2012. *Id*. at 475–78. He observed a steady gait and normal strength, sensation, and reflexes. *Id*. at 477. Dr. Gebrail diagnosed low back pain secondary to a herniated disc at L5-S1 status post microdiscectomy. *Id*. He concluded she would have difficulty with heavy lifting, bending, twisting, pushing, pulling, and prolonged sitting and standing. *Id*.

6

Case 7:15-cv-00157-RN   Document 27   Filed 04/18/16   Page 6 of 19

Brown continued to treat with Dr. Pecoraro for her pain symptoms. *Id*. at 494–95. He recommended exercise to strengthen her core. *Id.* In July 2012, Dr. Miller noted palpable tenderness but normal strength and sensation. *Id*. at 491. As x-rays failed to disclose any abnormalities, Dr. Miller opined that her pain was muscular and recommended physical therapy. *Id*.

Brown continued follow up care in September 2012, when she had some tenderness but noted physical therapy was going well (*id*. at 492–93); in November 2012, at which time her medication regimen was switched (*id*. at 489–90); in February 2013, when she reported the stimulator helped her leg pain but that she still had back pain (*id*. at 487); in May 2013, Brown reported back pain and her medications were refilled (*id*. at 483–84); in August 2013, she reported pain in her left side and down her left leg from lifting and caring for her mother, and she was given pain medication and steroids (*id*. at 542–43); and in November 2013 she reported continued leg pain with decreased lumbar range of motion but good strength, sensation, and reflexes (*id*. at 539–41).

In February 2014, Brown continued to report leg pain and that her stimulator was not working. *Id.* at 547–52. In May 2014, she had stopped taking her medications due to lack of funds. *Id.* at 550–52. Examination revealed an antalgic gait but good and equal strength and intact sensation. *Id.* at 551.

### D.     Conflicting evidence

Brown first argues that ALJ Henderson erred by failing to resolve the conflict between the testimony of VE and the Dictionary of Occupational Titles ("DOT") as to the sit/stand option. The Commissioner contends that no conflict exists and that ALJ Henderson appropriately accounted for Brown's well-supported limitations by including a sit/stand option in the RFC

7

Case 7:15-cv-00157-RN   Document 27   Filed 04/18/16   Page 7 of 19

determination. The undersigned finds that the DOT does not preclude a sit/stand option and that the VE's testimony satisfied the Commissioner's step five burden.

An ALJ should take administrative notice of job information contained in the DOT. 20 C.F.R. §§ 404.1566(d), 416.966(d). Furthermore, SSR 00–4p indicates that "we rely primarily on the DOT . . . for information about the requirements of work in the national economy." An ALJ may solicit testimony from a VE to address how particular restrictions affect a claimant's abilities to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because a VE's opinion can conflict with the information contained in the DOT, the SSA promulgated SSR 00–4p to explain how these conflicts should be resolved. The ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and the information provided in the DOT. SSR 00–4p. Before relying on a VE's testimony to support a disability decision, the ALJ must obtain a reasonable explanation for any apparent conflicts between the evidence testified to by the VE and the information contained in the DOT. *Id*. The ALJ must then explain in the determination or decision how any conflict that has been identified was resolved. *Id*.

The DOT does not address the sit/stand option. The Fourth Circuit has not yet addressed whether VE testimony regarding a sit/stand option creates a conflict with the DOT as contemplated by SSR 00–4p. However, some courts have concluded that a sit/stand option is not irreconcilable with the DOT. *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (holding that no conflict appeared to exist); *Wellington v. Astrue*, No. 12 Civ. 3523(KBF), 2013 WL 1944472, at *4 (S.D.N.Y. May 9, 2013) (unpublished) (finding no actual conflict between the VE and the DOT regarding the sit-stand option); *Lusk v. Astrue*, No. 1:11-CV-00196-MR, 2013 WL 498797, at *5 (W.D.N.C. Feb. 11, 2013) (unpublished) (finding "no conflict existed between the VE's testimony and the DOT" where "[t]he DOT is silent as to the availability of a sit/stand

8

Case 7:15-cv-00157-RN   Document 27   Filed 04/18/16   Page 8 of 19

option[.]"); *Thompson v. Astrue*, No. 8:09-CV-1968, 2010 WL 3878729, at *5 (D.S.C. June 16, 2010) (finding no conflict when the DOT did not address the sit-stand option); *Corbett v. Astrue*, No. 1:04-cv-241, 2006 WL 5527015, at *62 (N.D.W. Va. Mar. 24, 2006) (finding that "the lack of a sit-stand option in the DOT does not conflict with the VE's testimony that certain jobs would be available with a sit-stand option in the national economy")).

At the hearing, ALJ Henderson questioned the VE about jobs available within Brown's RFC. ALJ Henderson asked the VE to advise him if her testimony varied from the information contained in the DOT, and she agreed she would do so. Tr. at 55. The following exchange then occurred:

> Q: Assume you have a person 41 to 49 years of age, high school education, past work experience as Ms. Brown, and that person would be limited to light work within the meaning of the [DOT], however, this person would further be limited to only occasional postural activities and would need an opportunity to sit or stand every 40 minutes or so. Would a person with those limitations be able to do any of the claimant's past work?
>
> A: No, Your Honor.
>
> Q: Would there be other work which would accommodate those limitations?
>
> A: Yes, Your Honor. A routing clerk . . . a work ticket distributor . . . [and] a stock checker . . . An employer is generally going to provide a table that is waist high and a chair for the individual to change positions with the three positions I have suggested. I have placed individuals over 35 years in those types of jobs that will allow for the sit or stand option, and this is how they are performed generally in the national economy.

*Id.* at 52. In his decision, ALJ Henderson specifically acknowledged that the DOT did not address a sit/stand option. *Id*. at 34. He determined that, "[p]ursuant to SSR 00–4p . . . the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." *Id*. The court concludes, therefore, that the VE's testimony regarding a sit/stand option does not conflict with the DOT.

9

Even if there were a conflict, the VE offered a reasonable explanation: her 35 years of experience in placing individuals in jobs. "Reasonable explanations for such conflicts, which may provide a basis for relying on the evidence from the VE or VS, rather than the DOT information, include . . . [i]nformation about a particular job's requirements . . . from a VE's or VS's experience in job placement or career counseling." SSR 00-4p, at *2. ALJ Henderson reiterated this explanation in the disability determination. Tr. at 34. Thus, ALJ Henderson was entitled to rely on her testimony

Brown also takes issue with ALJ Henderson's use of the term "accommodate" in questioning the VE. She maintains that the Social Security Regulations do not permit accommodated work, because it is not "substantial gainful work." 20 C.F.R. § 404.1573. As the Commissioner argues, however, ALJ Henderson used the term "accommodate" to mean permit or allow. Clearly, both the Act and the Regulations contemplate work being performed with "allowed" or "permitted" limitations. Consequently, Brown's argument lacks merit.

Brown also asserts that the RFC failed to include frequent breaks, noting that she would require time away from her workstation. As the Commissioner point out, however, these limitations were not credited by the ALJ. As such, they need not have been included in the RFC or in the hypothetical questions posed to the VE at step five. Moreover, the VE testified that a sit/stand option could be incorporated into the jobs identified and would allow an individual to change positions at the workstation. Tr. at 52. Consequently, although Brown testified she needed to change positions and get up and move about (*id.* at 46), there is no evidence suggesting she could not do so at her workstation if provided a sit/stand option.

In light of the particular evidence presented in this case, the undersigned finds that ALJ Henderson complied with the requirements of SSR 00–4p. The ALJ met his obligation to ask

about possible conflicts between the VE testimony and the information provided in the DOT. The VE testified, and ALJ Henderson's decision noted, the sit/stand option is not addressed in the DOT. *See* Tr. at 34, 52. Accordingly, there is no conflict between the two, and there is no error of an unresolved conflict at step five. Brown's argument on this issue must therefore be rejected.

### E. Medical opinion evidence

Brown argues next that ALJ Henderson erred in evaluating the medical opinion evidence. Brown maintains that it was error for ALJ Henderson to give significant weight to part of the opinion of Dr. Gebrail, but assign little weight to another part of his opinion. She further contends that ALJ Henderson was obligated to contact Dr. Pecoraro for clarification as to his opinion. The Commissioner asserts that ALJ Henderson's consideration of the medical opinions was proper. The court agrees.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(d) (1998).

According to 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when

well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(e)(1) (1998). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given. *See* 20 C.F.R. § 404.1527(d)(3) (1998). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See* 20 C.F.R. § 404.1527(c)(4).

As noted above, Dr. Gebrail examined Brown in April 2012. He observed a steady gait and intact coordination, sensation, and strength in all extremities. Tr. at 31. He also noted tenderness in her back but found that her range of motion was within normal limits. *Id.* Dr.. Gebrail opined that Brown would have difficulty with prolonged sitting or standing and that she would have difficulty with heavy lifting, bending, twisting, pushing, and pulling. *Id.* at 32. ALJ Henderson gave significant weight to Dr. Gebrail's conclusions as to Brown's limitations in sitting and standing, finding it was consistent with the RFC, which included a sit/stand option. *Id.* He gave little weight to the limitations in lifting, bending, twisting, pushing, and pulling, concluding because Dr. Gebrail's opinion failed to offer specific limitations for these activities. *Id.*

An ALJ is not required to accept or reject a medical opinion in whole. In considering the record, an ALJ may accept some parts of the medical evidence and reject other parts, so long as she considers all of the evidence and gives some reason for discounting the evidence he rejects. *Ford v. Colvin*, No. 15-603, 2016 WL 344730, at *2 (W.D. Pa. Jan. 28, 2016) (citation omitted); *Shrigley v. Colvin*, No. 2:13-cv-0254, 2014 WL 111160, at *5 (E.D. Ca. Jan. 9, 2014) (noting that an ALJ may properly rely upon only selected portions of a medical opinion while rejecting other parts, as long as it is consistent with the medical record as a whole). Here, ALJ Henderson noted that Dr. Gebrail assessed these limitations for lifting, bending, twisting, pushing, and pulling in general terms and did not denote the frequency or duration Brown could perform these activities. Without more specificity, these limitations lack supportability to warrant assigning more weight to this part of Dr. Gebrail's opinion. Moreover, ALJ Henderson's RFC determination limited Brown to only occasional postural activities, which would include bending and twisting. Additionally, her RFC for a limited range of light work reflects jobs that would not require lifting more than 10 pounds frequently or 20 pounds occasionally. SSR 83-10. Consequently, Brown has not established ALJ Henderson erred in considering Dr. Gebrail's opinion.

Dr. Pecoraro, along with Dr. Melin, opined that Brown was capable of light work. Finding these opinions consistent with the record as a whole, ALJ Henderson gave them significant weight. Tr. at 32. He also noted that both physicians had previously opined that Brown was capable of sedentary work, but gave these earlier opinions little weight, noting that Drs. Pecoraro and Melin eventually adopted the assessment for light work. *Id*.

After ALJ Henderson's decision, Dr. Pecoraro submitted a letter from May 2014. *Id*. at 545. In it, he stated that Brown had multiple functional limitations, including a reduced lumbar

range of motion and limited tolerance for sitting and standing, which required her to frequently change positions. *Id*. Dr. Pecoraro opined that Brown was totally disabled. *Id*.

Brown contends that the subsequently-produced evidence indicates that ALJ Henderson was confused as to Dr. Pecoraro's opinion. In such instances, the Regulations direct an ALJ to re-contact a treating source for clarification. SSR 96-5p. However, as the Commissioner points out, Dr. Pecoraro's May 2014 letter was not in the record before ALJ Henderson. The evidence in the record contained an opinion from Dr. Pecoraro that Brown was capable of light work. Tr. at 426. Dr. Pecoraro's finding that Brown had a limited tolerance sitting and standing is reflected in the RFC determination that included a sit/stand option that allows Brown to change positions every 30 minutes. To the extent Dr. Pecoraro opined that Brown is disabled, that is a finding reserved to the Commissioner. *See* SSR 06–03p ("[T]he ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner.").

In sum, Brown has failed to establish any confusion or vagueness in Dr. Pecoraro's opinion in the record before ALJ Henderson that required he be re-contacted for clarification. Consequently, she has failed to establish any error by ALJ Henderson in the consideration of the medical opinion evidence. For this reason, her argument on this issue lacks merit.

### F. Listings 1.02, 1.03, and 1.04

Brown contends that ALJ Henderson erred in failing to find she met Listings 1.02 (major dysfunction of any joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), and 1.04 (disorders of the spine). The Commissioner argues that ALJ Henderson properly concluded that Brown's impairments did not meet or equal the severity of these Listings. The undersigned concludes that ALJ Henderson evaluated Brown's impairments under the Listings and properly found that she did not satisfy the requisite criteria of these Listings.

The "Listing of Impairments" details impairments that are "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 416.925(a). If a claimant's impairments meet all the criteria of a particular listing, 20 C.F.R. § 416.925(c)(3), or are medically equivalent to a listing, *id.* § 416.926, this alone establishes that the claimant is disabled. *Id.* § 416.920(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard [for disability more generally]. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (stating that the listings are designed to weed out only those claimants "whose medical impairments are so severe that it is likely they would be disabled regardless of their vocational background").

The claimant has the burden of demonstrating that his or her impairments meet or medically equal a listed impairment. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *see also Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012). As such, a claimant must present medical findings equal in severity to all the criteria for that listing: "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530–31; *see also* 20 C.F.R. § 416.925(c)(3). The regulations provide:

> Can your impairment(s) meet a listing based only on a diagnosis? No. Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.

20 C.F.R. § 416.925(d); *see also Mecimore v. Astrue*, No. 5:10–CV–64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) ("Diagnosis of a particular condition or recognition of certain symptoms do not establish disability.").

An ALJ is not required to explicitly identify and discuss every possible listing; rather, he is compelled to provide a coherent basis for his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Meador v. Colvin*, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)). Nevertheless, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." *Id.*

In establishing a Listing impairment, a claimant need not establish all the signs and symptoms for that Listing were present at the same time. As the Fourth Circuit emphasized in *Radford*, "'abnormal physical findings may be intermittent,' but a claimant may nonetheless prove a chronic condition by showing that he experienced the symptoms 'over a period of time,' as evidenced by 'a record of ongoing management and evaluation.'" 734 F.3d 294 (citations omitted).

Here, ALJ Henderson discussed Listings 1.02 and 1.04. Tr. at 28. Listing 1.02 (major dysfunction of any joint) requires:

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> OR
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.02. An "inability to ambulate effectively" requires "the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* at § 1.00B(2)(b). Further, an "inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities." *Id.* at § 1.00B(2)(c).[2]

ALJ Henderson concluded that Brown failed to meet this Listing. *Id.* He noted that Brown had not demonstrated either an inability to ambulate effectively or an inability to perform fine and gross movements effectively. Therefore, he concluded that she could not satisfy the criteria of Listing 1.02. Brown has not identified evidence in the record showing she required an assistive device to ambulate. Nor has Brown put forth evidence demonstrating that she is unable to perform fine and gross movements with her upper extremities.

Although not discussed by ALJ Henderson, Listing 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) requires "reconstructive surgery or surgical arthrodesis of a major weight- bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12

---

[2] "Examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself [and] the inability to take care of personal hygiene[.]" 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B(2)(c).

months of onset." Because Brown cannot show an inability to ambulate effectively, her impairments do not meet Listing 1.03.

ALJ Henderson also found that Brown did not meet Listing 1.04 (disorders of the spine). Tr. at 28. Under this Listing, a claimant first must show a disorder of the spine, such as a "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [and/or] vertebral fracture . . . resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 1.04. To meet part A of the Listing, a claimant must then demonstrate:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04A. In support of her argument that she meets Listing 1.04, Brown directs the court's attention to the arguments she advanced before the Appeals Council. *See* D.E. 22 at 18; tr. at 323–27. Her argument therein is brief, but states that she "has demonstrated weakness in her lower extremities, has significantly impaired lumbar range of motion . . . and has demonstrated a positive straight leg raise." *Id*. at 325.[3]

In *Radford*, the Fourth Circuit concluded that Listing 1.04A requires a claimant to show only what it requires him to show: that each of the symptoms were present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months. *Radford*, 734 F.3d at 294. Even crediting Brown's argument that she has shown weakness in her lower extremities, reduced range of motion in her lumbar spine, and a positive straight leg raise, she has not identified sensory or reflex loss accompanying motor loss. In fact,

---

[3] Given this argument, coupled with a lack of evidence of either spinal arachnoiditisas or lumbar spinal stenosis, it appears Brown is contending that she qualifies under Listing 1.04A and not 1.04B or 1.04C.

the record demonstrates normal motor, sensory, and reflex functions upon examination. Tr. at 343, 353, 357, 370, 378, 411, 419, 421, 423, 431, 448, 450, 484, 488, 491, 493-94, 517, 526, 540, 543, 551. While records noted Brown had muscle weakness on two occasions, it was not accompanied by sensory or reflex loss. *Id*. at 350–51. Brown has therefore failed to carry her burned to demonstrate that the record demonstrates that each of the Listing 1.04A symptoms have been present. Consequently, the undersigned cannot conclude that she meets this Listing.[4] Brown has therefore failed to establish error in ALJ Henderson's step three determination.

## III. Conclusion

For the forgoing reasons, the court denies Brown's Motion for Judgment on the Pleadings (D.E. 21), grants Colvin's Motion for Judgment on the Pleadings (D.E. 25), and affirms the Commissioner's decision.

Dated: April 18, 2016

                                        *Robert T. Numbers II*
                                        ROBERT T. NUMBERS, II
                                        UNITED STATES MAGISTRATE JUDGE

---

[4] Brown has similarly failed to demonstrate that her impairments are medical equivalent to any of these Listings